UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON


CIVIL ACTION NO. 09-302-GWU


KATHERINE WAGERS,                                                    PLAINTIFF,


VS.                          **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                      DEFENDANT.


**INTRODUCTION**

     The plaintiff brought this action to obtain judicial review of an administrative

denial of her applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI).  The appeal is currently before the court on cross-motions

for summary judgment.

**APPLICABLE LAW**

     The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

     1.     Is the claimant currently engaged in substantial gainful activity?
            If so, the claimant is not disabled and the claim is denied.

     2.     If the claimant is not currently engaged in substantial gainful
            activity, does he have any "severe" impairment or combination
            of impairments--i.e., any impairments significantly limiting his
            physical or mental ability to do basic work activities?  If not, a
            finding of non-disability is made and the claim is denied.

3.    The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.    At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.    If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence.  Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

2

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. § 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

<u>Duncan v. Secretary of Health and Human Services</u>, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  <u>Harris v. Secretary of Health and Human Services</u>, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations.  <u>Id.</u>  Accord, <u>Johnson v. Secretary of Health and Human Services</u>, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  <u>Gooch v. Secretary of Health and Human Services</u>, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, <u>Hale v. Secretary of Health and Human Services</u>, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, <u>McKnight v. Sullivan</u>, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).   However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance

on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Katherine Wagers, was found by an Administrative Law Judge (ALJ) to have "severe" impairments due to degenerative changes of the cervical and lumbar spine. (Tr. 10). Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that the plaintiff retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 11-14). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether the plaintiff, a 47-year-old woman with an eighth grade education and unskilled work experience, could perform any jobs if she were limited to "light" level exertion, with the option of sitting and standing as necessary, and also had the following non-exertional restrictions. She: (1) could have no exposure to workplace hazards such as unprotected heights and moving machinery; (2) needed to avoid temperature extremes and vibration; (3) could occasionally stoop, crouch, or crawl; (4) could not climb ladders, ropes, or scaffolds; and (5) could occasionally use her right arm for reaching and feeling. (Tr. 34-5). The VE responded that there were jobs that such

a person could perform, and proceeded to give the numbers in which they existed in the state and national economies.  (Tr. 35).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence.

The plaintiff alleged disability beginning May 7, 2007 due to pain and "slipped discs" in her neck, and depression.  (Tr. 103).

The medical evidence in the transcript shows that the plaintiff had a long history of neck pain, dating back at least to March, 2000, when she was working in a factory.  (Tr. 276-8).  An MRI of the cervical spine on September 6, 2000 was interpreted as showing moderate to severe neuroforaminal encroachment on the left side of the C5-C6 vertebrae as a result of spondylosis.  (Tr. 191).  Office notes from family physicians indicate that by April, 2001, the plaintiff was reporting that she could perform her normal job, but had difficulty with constant motion, and her employer kept "moving her back and forth to the assembly line where she has problems because she has to lift up and down all the time."  (Tr. 196).  In any case, she continued to work, and in 2003 began seeing Dr. John Gilbert, a neurologist, and his associates for complaints of head, neck, and arm pain.  A new MRI of the cervical spine in January, 2006 showed a protrusion at the C6-C7 level, and a variety of other conditions including spondylosis, kyphosis, stenosis and compression involving all of the cervical spine levels between C4 and C7.  (Tr. 229).

8

A repeat MRI in December, 2006 was similar.  (Tr. 230-1).  An EMG/NCV study in January, 2006 was interpreted as showing an abnormality of the left median and ulnar nerves, indicating entrapment primarily at the C5-C7 levels.  (Tr. 234, 292).  The plaintiff was allowed to return to work at her request in May, 2006 on "light duty" with no lifting greater than 15 pounds and no repetitive handling, crouching, or reaching overhead.  (Tr. 234, 259).  However, by November, 2006 she was complaining of increased neck and arm pain with increased numbness, tingling, and weakness of the hands.  (Tr. 252).

One of the plaintiff's family physicians, Dr. Wajdi Kfoury, referred Mrs. Wagers to a pain clinic in March, 2007.  (Tr. 296).  She was examined at the pain clinic both by Dr. Ionut Stefanescu, M.D., and Dr. Shawn Hudson, D.O., who reviewed MRI and nerve conduction study reports, conducted a physical examination, and diagnosed moderate to severe chronic pain, degenerative disc disease and stenosis of the cervical spine, cervicalgia of the neck and cervical radiculopathy, and an intervertebral disc disorder of the cervical spine, along with opioid dependence, albeit with a urine drug screen which was consistent with the clinic policy.  (Tr. 345-7).  She continued seeing these sources in 2007, and it was noted in November that she had bilateral upper extremity radiculopathy and needed to obtain a "spend down card" to get an evaluation by a neurologist.  (Tr. 329-32).

On February 19, 2008, after almost ten months of treatment, Dr. Hudson completed a physical medical assessment form indicating that the plaintiff should lift no weight either occasionally or frequently, had no restrictions on standing, walking, or sitting, should never climb, stoop, kneel, balance, crouch, or crawl, would have limitations on reaching, handling, feeling, pushing, and pulling, and, due to her medications, should avoid heights and moving machinery.  (Tr. 380-81).

Prior to Dr. Hudson's opinion, Mrs. Wagers underwent a consultative evaluation by Dr. Robert Hoskins on October 19, 2007.  Dr. Hoskins reviewed one of the MRI scans and the NCV report.  (Tr. 316).  He noted that she complained of neck and right arm pain, a loss of sensation in the right upper extremity, and depression, fatigue, and poor sleep.  (Tr. 315).  She stated that neck pain and stiffness were a constant problem, and on two occasions in the past year she had "lost control" of her right arm, which still remained weak.  (Id.).  She reported numbness in all the fingers of both hands, but the numbness was more severe and more frequent in the right hand.  (Id.).  On examination, Dr. Hoskins noted that the plaintiff seemed fatigued and generally uncomfortable.  He noted 4/5 strength in the arms and that she tested as having zero grip in the right hand and 20 pounds in the left hand.  (Tr. 315-16).  She reported tenderness over the cervical lumbar areas, even with "just a brush of the skin that should not have affected any underlying muscular or bony structures."  (Tr. 316).  Subjectively, she had limitation with

bending, and was unable or unwilling to do certain activities such as toe and heel walking.  Deep tendon reflexes were unremarkable and no sensory deficits were identified.  (Id.).  She was able to sit and squat to and stand from a 19-inch chair, and the physician perceived no discomfort at rest.  Dr. Hoskins stated that due to the dysfunctions in the upper extremities, he would expect her to have "strong limitations . . . and possibly exclusions for fine manipulations including buttoning clothing, picking up small items and writing, gross manipulations, handling, gripping, reaching, lifting, and carrying."  (Id.).  He also expected "some limitations in regard to standing, walking, climbing stairs and squatting on the basis of observation and history in the office."  (Tr. 316-17).  In conclusion, he added that while he believed that the tenderness she had demonstrated in the cervical spine and lumbar area were likely exaggerated, "I would like to point out that exaggeration does not equate to fabrication."  (Tr. 317).

A state agency physician, Dr. John G. Cocoris, reviewed the evidence after the receipt of the Hoskins report, but apparently prior to the time any evidence was available from Dr. Stefanescu and Dr. Hudson, and concluded that Mrs. Wagers would be capable of light level exertion with no climbing of ladders, ropes, and scaffolds, occasional stooping, crouching, and crawling, occasional reaching, handling, and fingering with the right upper extremity and a need to avoid all exposure to hazards and concentrated exposure to extreme cold, heat, and

vibration. (Tr. 322-8). She could push and pull less than one-third of the time with the right upper extremity and needed to change positions every two hours due to back and upper extremity discomfort. (Tr. 323). Dr. Cocoris reasoned that there was medical evidence for severe degenerative disc disease of the cervical spine and mild degenerative disc disease of the lumbar spine which produced credible symptoms although there was some doubt as to her effort and her subjective pain complaints on the Hoskins examination. (Tr. 326). The medical evidence was not clear on the severity of her radiculopathy. A subsequent reviewer affirmed these restrictions on December 26, 2007, noting that additional medical evidence had been requested but not received. (Tr. 372-8). Therefore, it does not appear that either state agency reviewer saw any of the evidence from Stefanescu and Hudson.

The ALJ stated in his decision that after considering all of the evidence, he could find no reason to depart from the opinion of the state agency sources. He discounted Dr. Hoskins's opinions due to their vagueness and the indications in his report that the plaintiff exaggerated her complaints of tenderness and the weakness of her grip. (Tr. 12). This reasoning is supported by substantial evidence, and, in any case, Dr. Hoskins was a one-time examiner whose opinion is not entitled to the same weight as a treating source. Moreover, his report was discussed in detail by Dr. Cocoris.

The ALJ's rejection of Dr. Hudson's opinion is more problematical.  Dr. Hudson was a treating source whose opinion is entitled to significant weight even in circumstances where it is not given controlling weight.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Social Security Ruling (SSR) 96-2p, pp. 9-10.  20 C.F.R. § 404.1527(d)(2) provides a number of factors which must be considered if the treating source opinion is not given controlling weight including the length of the treatment relationship, the nature and the extent of the treatment relationship, the supportability of the opinion, its consistency with the record as a whole, the specialization of the treating source, and other factors.  Id.  The ALJ discounted Dr. Hudson's opinion by briefly stating that it was "obviously excessive" to indicate that the plaintiff could lift and carry no weight, since she would not be able to care for her own personal needs or even feed herself.  (Tr. 13).  Nor did he believe that there was any evidence to support an opinion that she could not engage in any climbing, stooping, kneeling, balancing, crouching, or crawling.  (Id.).

In an unpublished decision, the Sixth Circuit recently has been critical of an ALJ's decision to reject a treating physician opinion because of "implausibility" on the grounds that it was an impermissible substitution of the ALJ's medical judgment for that of the treating physician.  Simpson v. Commissioner of Social Security, 344

Fed. Appx. 181, 2009 WL 2628355 (6th Cir. August 27, 2009) (citations omitted). In the present case, the plaintiff testified that she could lift five pounds, but because her hands would frequently go numb, she would have to stop working. (Tr. 24, 28). She stated that her fingers would become stiff and numb if she performed such activities as sewing, writing a letter, or holding an object in her hands for 15 minutes. (Tr. 31). In such circumstances, it is not necessarily implausible that Dr. Hudson would indicate that she could lift no weight even occasionally, since "occasionally" is defined on the form used by the physician as "up to one-third of an eight-hour day." (Tr. 380). In addition, while Dr. Hudson did not specifically indicate the reasons for limiting postural activities on the form, office notes do reflect findings of pain and radicular signs on examination of the back. (E.g., Tr. 383-404). Therefore, the complete rejection of the treating physician opinion without a countervailing opinion from a medical reviewer who had the opportunity to evaluate and comment on all of the evidence was an error. Blakley v. Commissioner of Social Security, 581 F.3d 399, 409 (6th Cir. 2009) (quoting SSR 96-6p, 1996 WL 374180, at 3).

There is an additional problem in rejecting Dr. Hudson's opinion in that the ALJ expressly relied on the state agency reviewers, but Dr. Cocoris had provided limitation on pushing and pulling less than one-third of the time with the right upper extremity (Tr. 323) which was not included in the hypothetical question. Pushing

14

and pulling are considered to be exertional characteristics of light level work.  SSR 83-14, 1983 WL 31254 at 1.  A restriction to less than "occasional" pushing and pulling would presumably have an effect on the occupational base which should have been considered by the VE.

The decision will be remanded for further consideration.

This the 22nd day of July, 2010.


**Signed By:**

**G. Wix Unthank**

**United States Senior Judge**